Town of Marion, Respondent, vs. Southern Wisconsin Power Company, Appellant.

*February 9—April 6, 1926.*

*Highways: Power dams: Overflowing highways: Liability of grantee of franchise to erect dam: Recovery by town of money spent to repair highways: Of road taxes worked out: Injunction: To refrain from damaging highways: Validity.*

1. Even if the legislature has the power to authorize a corporation organized for the purpose of generating and transmitting electric power for public purposes to overflow the highways of the state by reason of the maintenance of a dam, and to grant to the corporation complete immunity from liability therefor, there is a strong presumption against any such legislative purpose, which must appear by a clear, affirmative expression of the legislative intent.  p. 501.

2. Until very recently there has been a common understanding on the part of the public and public officials and on the part of grantees of franchises to erect dams that such grantees were liable for damages resulting to highways; and while there is nothing conclusive about the assumption, such conduct approaches a practical construction of the grants and is of weight in considering the legislative intent.  p. 502.

3. The legislature has full control over the highways of the state and may lay out or abandon them; but the state does not have title in fee to a highway.  p. 504.

4. The word "injure," as used in sec. 2 of ch. 462 of the Laws of 1901, is not ·confined to a technical wrong, but the grantees of a franchise to build a dam are liable for all damages inflicted by their enterprise and for all injuries done to property.  p. 505.

5. While a power company may trespass with its waters upon the highways of the state, it must respond to a town in the amount which the town necessarily expends in repairing the resulting damage; and the town can also recover the amount represented by highway taxes worked out by a taxpayer.  p. 506.

6. A judgment for all sums expended by the town in repairing such highways is excessive, however, where the town always had been required to make some expenditures, since the defendant is liable only for sums necessarily disbursed in repairing the damage committed by it.  p. 507.

7. The court cannot restrain the power company from damaging the town highways where such damage was the necessary and inevitable result of maintaining the dam authorized by ch. 462, Laws of 1901, since it cannot enjoin the maintenance of a dam erected in accordance with legislative permission. p. 508.

8. Where the overflow of the dam was partially responsible for the damage to certain town highways, the town must repair the damage attributable to the maintenance of the dam from year to year, and bring separate and successive actions to recover such expenditure. p. 509.

ESCHWEILER, ROSENBERRY, and DOERFLER, JJ., dissent.

APPEAL from a judgment of the circuit court for Juneau county: E. W. CROSBY, Circuit Judge. *Reversed.*

For the appellant there was a brief by *Schubring, Ryan, Clarke & Petersen* of Madison, and oral argument by *William Ryan.*

For the respondent there was a brief by *Olin & Butler,* and oral argument by *Clifford G. Mathys* and *R. M. Rieser,* all of Madison.

OWEN, J. The defendant is a corporation organized, among other things, for the purpose of generating and transmitting electric current for public purposes. It owns and operates a hydro-electric plant and dam on the Wisconsin river at the village of Kilbourn, under and by virtue of the provisions of ch. 462, Laws of 1901. This action is brought by the plaintiff town to recover moneys alleged to have been expended by said town in repairing damage suffered by the highways in said town by reason of the maintenance of said dam, in holding back the waters and causing the overflow of said highways. The defendant appeals from a judgment rendered in favor of the plaintiff, and contends that no legal obligation rests upon the defendant company to recoup the town for damages thus sustained. The argument of appellant's counsel is based upon many fundamental principles, the correctness of which is conceded. Their rea-

soning is cogent and persuasive. But there is something wrong with any line of reasoning which leads to the conclusion that a power company, organized and engaged in business for profit, may overflow and damage the highways of a town without incurring any liability therefor. Such a conclusion is offensive to an intuitive sense of justice. It has never received the sanction of any court.

Assuming that the legislature has the power to authorize a company such as the defendant to overflow the highways of the state and to grant to such corporation complete immunity from liability therefor, the manifest injustice of such action raises the strongest presumption against any such legislative purpose, and requires clear, affirmative expression of such a legislative intent.

In Massachusetts it was contended that the milldam act authorized owners of milldams to overflow public highways, and the fact was pointed out that the milldam act contained no express provision for the compensation of the public for damages resulting from such overflow. The court disposed of this contention by saying: "There being no provision for an indemnity to the public, it seems manifest that no encroachment on the public rights was intended to be sanctioned." *Inhabitants of Andover v. Sutton,* 12 Met. (53 Mass.) 182, 187. In considering the exact contention here made by appellant the supreme court of South Carolina, in *Edgefield County v. Georgia-Carolina P. Co.* 104 S. C. 311, 88 S. E. 801, said: "But such intent will not be lightly inferred; the intent to do so must be a necessary implication of the words of the grant and the purpose of the grant." These are the only cases cited to our attention which seem to have any direct bearing upon the question here involved, and we think they state the proper rule by which the legislative intent should be tested. The burden of maintaining highways rests too heavily upon taxpayers to justify a presumption that the legislature intended to add to those burdens for the benefit of private interests.

Before turning to the act authorizing the construction of the dam which it is claimed grants immunity for damages caused to highways, it is proper to reflect that during the history of our state the legislature has authorized the construction of innumerable dams upon our public waters, which, while ostensibly for the purpose of promoting navigation, were in reality for the purpose of promoting private enterprise. An examination of forty or fifty of such charters discloses but one, ch. 180, Laws of 1903, which makes any reference to the liability of the dam owner for damages to highways resulting from the operation of the dam. Nevertheless there is reason to believe that the beneficiaries of all such grants have assumed that they were liable to towns for damages resulting to highways by reason of the maintenance and operation of the dam. One reason for this assumption is that very few cases have reached this court involving the liability of a power company for such damages, and the thought is not to be indulged that such manifest injustice would be suffered by the various towns of the state, the highways of which must have been damaged by reason of such operations, without a protest reaching this court. But two such cases have come to this court. One is *Levis v. Black River Imp. Co.* 105 Wis. 391, 81 N. W. 669. From that case it appears that the Black River Improvement Company assumed that it was liable for such damage and entered into a contract with the town to compensate it for damages resulting to the highways of the town by reason of the maintenance of its dam. The other case is *Dekorra v. Wis. River P. Co.* 188 Wis. 501, 205 N. W. 423, where it also appears that this defendant assumed that it was liable for such damages and contracted with the town to construct a new road, laid out in lieu of one overflowed by the back waters of this very dam.

Thus there is reason to believe that until a very recent date there has been a common understanding not only on the part of the public and public officials, but on the part of

the grantees of such franchises as well, that all dam owners acting under grants similar to ch. 462, Laws of 1901, were liable for damages to highways resulting from the maintenance and operation of their dams. While we concede that there is nothing binding or conclusive about this assumption, such conduct approaches a practical construction of such grants, is not without weight in considering the legislative intent as revealed by the terms of these grants, and may furnish a reason for the legislative silence concerning the liability of such grantees for such damages. In this attitude of mind we turn to the grant under the authority of which defendant maintains its dam.

By sec. 2 it is declared that "In case it shall be necessary to take, flow *or injure* any lands and property, or either thereof, for the purpose or purposes of the construction or use of the dam," the grantee shall be subject to the provisions and entitled to all the benefits and remedies of ch. 146, Stats. 1898 (the Milldam Act). By sec. 3 of the act it is further provided that for the purpose of acquiring the necessary lands, easements, or privileges in lands necessary for flowage, said grantees may enjoy the rights granted to and conferred upon corporations by secs. 1777 to 1777e, both inclusive, of the Statutes of 1898, and also by secs. 1850 to 1857, both inclusive, of the Statutes of 1898, and such amendments as may have been made to any of said sections. Secs. 1777 to 1777e, inclusive, relate to the powers, duties, and liabilities of corporations organized for the improvement of any stream and driving logs therein, while secs. 1850 to 1857 relate to the exercise of the right of eminent domain by railroad companies. The effect of these provisions is to confer upon the defendant company burdens, privileges, and remedies of the Milldam Act and the usual powers of eminent domain in order to enable it to procure title to *lands* and *property* necessary for it to take, flow, *or injure* in the prosecution of its enterprise.

It is claimed that none of these statutes confer the right

to take property belonging to the state; that the highways belong to the state; that the grant contemplated that highways would necessarily be overflowed by the construction and maintenance of the dam as authorized; and that by the failure of the act to provide for the taking of property belonging to the state the legislature must have intended to permit the taking and flowing of any land and property belonging to the state. This was the holding in *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 659, 11 N. W. 443, where, in order to construct a dam, it was necessary to take a certain piece of real estate belonging to the state of Wisconsin. It appeared in that case that the construction and maintenance of the dam as authorized by the legislature was impossible without taking this real estate belonging to the state. It was necessary to hold, therefore, either that the state had consented to the use of this property, or to hold that it was impossible for the grantees to build the dam as authorized. The court held that in view of the fact that the legislature knew that the construction and maintenance of the dam would involve the taking of this property belonging to the state, it must be assumed that the legislature intended to permit the use of the property without compensation. We have no quarrel with that holding. But we do not think it has any application here. There is a wide difference between real estate to which the state holds title in fee simple and the highways of the state. It may be granted that the legislature has full control over the highways of the state, that it may lay out highways and that it may abandon highways. But it has no such thing as title in fee to a highway. It may well be that whatever title the public has in a highway rests in the state. But that is a question which we do not deem it necessary to consider. The public has no title to a highway which is subject to the exercise of the sovereign right of eminent domain. The fact that the right of eminent domain cannot be invoked by the defendant to ac-

quire the right to overflow highways does not argue that the
state intended to grant such right without requiring the
beneficiaries of the grant to compensate the towns for dam-
age done. On the contrary, there seems to be a purpose on
the part of the legislature to make the grantees of the act
liable to any and all sustaining damage by reason of the
operation of the dam.

Sec. 2 provides that in case it shall be necessary to take,
flow, *or injure* any lands and property, it shall be done sub-
ject to all of the provisions of the statutes therein enumer-
ated. The word "injury" as used in this act is not to be
construed in its technical legal sense, *i. e.* an actionable
wrong, but rather in the popular and usual sense, namely,
an act resulting in damage. "If the word were to be con-
strued in its strict technical sense the insertion of it in the
statute would accomplish little, if anything; construed in
the usual sense, however, it becomes a reasonable and just
provision requiring the licensees to make compensation for
all damage inflicted by their enterprise." *Wells v. Wis.
River P. Co.* 167 Wis. 345, 347, 167 N. W. 445. So far as
applicable, the remedies provided by the Milldam Act, and
the other statutes mentioned in the act, are available to the
defendant to enable it to acquire necessary rights so far as
such remedies are suitable and efficient for that purpose. It
is not to be implied, however, that the liability of the de-
fendant ceases at the point where the remedies of the Mill-
dam Act, or the other statutes referred to in the act, end.
The defendant, no doubt, is liable for a great variety of
damage not covered by the Milldam Act or the other stat-
utes imported into ch. 462, Laws of 1901. The word "in-
jury" as construed by this court in *Wells v. Wis. River P.
Co., supra,* is significant. It is not confined to a technical
wrong. It makes the grantees liable for all damage inflicted
by their enterprise. The immunity enjoyed by the state
from incidental damage resulting from the prosecution of

a governmental function is not conferred upon the grantees under the act. They are liable for all injuries done to property. We see nothing in the act to indicate or to lead us to believe that the legislature had any thought or purpose of licensing the grantees under the act or their assigns to damage the highways of this state *ad libitum*, without let or hindrance or liability. Such a burden imposed upon the taxpayers for the benefit of a private enterprise operated for gain and profit is so obnoxious to a sense of justice that such a purpose should be declared in the clearest and most unequivocal language. While without doubt the power company is authorized to overflow highways (*Dekorra v. Wis. River P. Co.* 188 Wis. 501, 205 N. W. 423), it by no means follows that it is authorized so to do without compensating the town for the damages thus incurred. Its act in so doing is not wrongful. It is done under the sanction of law. *Dekorra v. Wis. River P. Co., supra; Stoughton v. State,* 5 Wis. 291. But in doing it, it incurs an obligation to reimburse the town for moneys expended in repairing the damage done. We do not see that it is necessary to classify the nature of the liability, whether it be in tort or on contract. It is a duty imposed upon it by law. We therefore hold that while the power company may trespass with its waters upon the highways of the state, it must respond to the town in the amount which the town necessarily expends in repairing the resulting damage. That right is enforceable only through an action by the town to recover the amount so expended. *Levis v. Black River Imp. Co.* 105 Wis. 391, 81 N. W. 669.

The appellant contends that the town cannot recover the amount represented by highway taxes worked out by a tax-payer. We can see nothing in this contention. The highway taxes are assessed upon the individual taxpayers the same as any other tax. It is a tax which they owe to the town. The law gives them the privilege of working out this tax or of paying it. In either event it represents taxes paid

by the taxpayer of which the town receives the full benefit. The town certainly is entitled to recover the taxes thus paid as well as the taxes paid in cash and disbursed from the town treasury in repair of the damaged highways.

While we arrive at the conclusion that the defendant is liable to the town for the damages resulting to the highways from the maintenance and operation of the dam, we have some difficulty in justifying the amount of the judgment in this case. It goes without saying that the defendant is liable only for such sums as the town has necessarily disbursed in repairing the damage committed by the defendant. It appears that the damaged highways have been in existence from a very early day. They are located on bottom lands. They have always been overflowed to a greater or less extent during high water, freshets, and floods. The highways in question never were easily maintained, and the town always was required to make expenditures for the purpose of keeping them in repair. There is testimony, which testimony is reduced to the form of tables appearing in the record, comparing the extent of overflow since the construction of the dam with the overflow prior to such construction. This testimony and these tables justify a finding that the waters of the Wisconsin river have trespassed upon the highways to a greater extent than they did before. There is also evidence that since the building of the dam there is a side current which does greater damage to the highways than resulted before the construction of the dam. But these comparisons do not very definitely indicate the additional burden imposed upon the town for their repair. The court rendered judgment in favor of the town for all sums expended for the repair of these highways during the years 1917 to 1924, inclusive. In other words, the court proceeded upon the assumption that but for the presence of the dam the town would have incurred no expense whatever for repair of these highways during the seasons of 1917 to

1924, inclusive.   Manifestly this conclusion is unjustified. It is certain that it would have cost the town something to keep these highways in repair even though the dam had never been built.   We cannot, therefore, affirm the judgment.   It may be difficult to determine just what the actual damage to the town has been by reason of the maintenance of the dam, but it is certain that the presence of the dam is not responsible for the entire expenditure of the town for. the repair and maintenance of these highways during the years in question.   There must be a new determination of damages.

The judgment further provides: "It is further adjudged and decreed that the defendant be and is hereby ordered and commanded to repair any and all damage or washing to said highways mentioned in the complaint hereafter caused by the waters of said dam."   We disapprove of this provision of the judgment.   It is plain that, the legislature having authorized the defendant to maintain the dam at a given height, a court can neither directly nor indirectly enjoin the defendant from maintaining the dam in accordance with legislative permission.   To enjoin it from doing damage or producing results which are inevitable from maintaining the dam in the manner authorized by the legislature is equivalent to enjoining the company from maintaining the dam at all.   A court, therefore, cannot enjoin the defendant from committing damage which is the necessary and inevitable result of. maintaining the dam.

It is said, however, that the injunctive provision of the judgment does not go to that extent.   Probably this is true. But, whether the mandatory injunctive feature of the judgment is within the power of the court to render, it is apparent that it is difficult if not impossible of enforcement.   The defendant can be compelled to repair only the damage for which it is responsible.   That it is not responsible for all the damage resulting to these highways by reason of overflow or floods is apparent from what already has been said.

It is impossible to single out any given damage and say that the defendant is responsible therefor.   Such an injunction could not be enforced.   While it appears well settled in this state that under proper circumstances a town may maintain an action in equity to prevent obstruction or damage to highways (*Neshkoro v. Nest,* 85 Wis. 126, 55 N. W. 176; *Levis v. Black River Imp. Co.* 105 Wis. 391, 81 N. W. 669), there seem to be insuperable difficulties in applying such a remedy in this case.   We are of the opinion that the only remedy available to the town is to first repair the damage attributable to the maintenance of the dam from year to year and bring separate and successive actions to recover the expenditures so made.

The judgment will be reversed, and cause remanded with directions to redetermine the damages.   This may be done upon the evidence taken upon the former trial and upon such further evidence as the parties may produce.   *Mitchell Realty Co. v. West Allis,* 188 Wis. 305, 206 N. W. 193.

*By the Court.*—So ordered.

ESCHWEILER, J. (*dissenting*).   With so much of the majority opinion as determines that there is a right of action to recover for amounts expended in repairing town highways damaged by the back water of defendant's dam I cannot agree.

It is conceded that the defendant's dam built in 1909 was erected across one of the navigable streams of this state which, under the constitution, art. IX, sec. 1, must remain forever free to the citizens of the United States as well as to the inhabitants of this state, and that such dam was erected and has been maintained pursuant to the express legislative authority given by ch. 462 of the Laws of 1901.

This chapter by its title authorized the building and maintaining of this dam for two express purposes: *First,* to improve the navigation of the Wisconsin river above the dam; and *second,* for the purpose of creating hydraulic power.

This act expressly gave the grantees four different methods or remedies by which title to or right to use lands might be acquired for the purpose of such construction and use; first, by purchase, lease, or license by act of the parties; second, by the remedies and provisions of ch. 146, Stats. 1898, "Mills and Milldams," so far as applicable and not inconsistent with said ch. 462; third, the rights granted to and conferred upon corporations by secs. 1777 to 1777e, inclusive, Stats. 1898, and any subsequent amendments thereto (these being the additional powers of log-driving corporations); fourth, the grantees "may enjoy the rights granted to and conferred upon corporations by sections 1850 to 1857, both inclusive," of the Statutes of 1898 (these being substantially all of the statutes of 1898 which conferred the right of eminent domain upon railroad corporations).

The right to alter, amend, or repeal this chapter was expressly reserved.

Of the foregoing four express grants the first needs no consideration here, and the second, or the chapter on milldams, as it was then found in the Statutes of 1898, was by sec. 3374 confined to the maintaining of water mills and dams to raise water for working them upon and across any stream that is *not* navigable. (This was expressly held to exclude streams declared to be, or in fact, "navigable or public highways." *Wood v. Hustis*, 17 Wis. 416, 418.) Said chapter on milldams also provided for the regulating of the height of the dam and the period of time for which it may be kept up each year, by verdict of jury (secs. 3376, 3381), and provided an exclusive remedy for compensation to any person whose land was overflowed or otherwise injured and which right was lost if not asserted within three years. *McDonald v. Apple River P. Co.* 164 Wis. 450, 456, 160 N. W. 156.

Manifestly here the permission to construct the dam across

a navigable stream, which under the constitution as above quoted must remain as a public highway, is an entirely separate matter.   Non-navigable streams, of course, are not the water highways referred to in the constitution and the Ordinance of 1787.   Navigable streams have been from an early date and continuously held to be "public highways by water" as they were at common law.   *Whisler v. Wilkinson,* 22 Wis. 572, 576; *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 348, 116 N. W. 4.   See, also, *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 Wis. 652, 655, 43 N. W. 660; *In re Crawford County L. & D. Dist.* 182 Wis. 404, 408, 196 N. W. 874.

In the third of the above specified methods, namely, the acquiring of necessary lands, rights, easements, or privileges so that "the complete construction of the dam may be successfully carried out" (to quote from the grant), they were to have the rights enjoyed by corporations under secs. 1777 to 1777e, which were particularly applicable because from their very terms they relate to navigable streams.   These particular provisions gave the right to flow lands and to acquire property and specify the methods of obtaining and paying for the same, and expressly provide, sec. 1777e, that such corporation may exercise the right of eminent domain and may acquire it in the manner prescribed in ch. 87 of the Statutes of 1898, namely, the railroad eminent domain statutes, covered and included in the fourth of the above specified grants.

In the fourth grant, which dips into the chapter regulating railroad corporations and takes therefrom certain express statutes relating to the power to acquire lands and interests therein and providing the method in which the constitutional provision for compensation shall be met for taking of private property, there are several important features to be here considered.   One is that whereas the legislature, by ch. 462 of the Laws of 1901, *supra,* twice clothes the grantees there

with the same rights and powers for condemning property under eminent domain that railroads have, yet it omits any reference to sec. 1836, created by ch. 119 of the Laws of 1872 and found in the same ch. 87 of Railroads.   This sec. 1836 expressly places upon every railroad crossing a stream, water-course, *street, highway,* or canal, etc., the duty to restore every such to its former state and thereafter maintain the same in such condition against any effects in any manner produced by such railroad.   It further expressly provided that when lands shall be required in order to change any such highway, street, etc., such required land may be condemned, taken, and compensation made in the manner provided in such ch. 87, and when so taken shall become a part of the highway.   Here, as clearly as can be done by express legislative language, a duty is placed upon a railroad company towards a public highway which the majority opinion in effect says shall be the duty of the defendant power company, and this latter without any express statute or any suggested method or remedy by which the defendant could acquire or obtain any lands necessary for the making of a substitute highway if the same should be absolutely necessary or more advantageous than the keeping up of the old. It is difficult to believe that the legislature intended by omitting reference to said sec. 1836 in said ch. 462 of the Laws of 1901, *supra,* to nevertheless place a similar burden on those improving a water highway that they did expressly on railroads and without giving those building the dam the power to substitute by condemning other lands for destroyed highways.

The legislature has no power under the constitution to authorize the construction of such dam except when, as was expressly declared in the present instance to be the purpose, as an aid to navigation, the right to use the power being but an incident (*In re Southern Wis. P. Co.* 140 Wis. 245, 261, 122 N. W. 801), and as is stated in the same case

(p. 262), when such improvement is made in conformity with the delegated power, neither the necessity nor the usefulness of the improvement, nor the manner in which it is made, can be called in question by private persons, citing among other cases the very pertinent case of *Wis. River Imp. Co. v. Manson,* 43 Wis. 255, 265.

That property devoted to one public use such as that for a land highway may be subjected by legislation to another public use, either with or without compensation, because the constitutional provision as to compensation for private property does not apply, is well established law. 20 Corp. Jur. 599; *Kilbourn v. Southern Wis. P. Co.* 149 Wis. 168, 182, 183, 135 N. W. 499; *In re Milwaukee Southern R. Co.* 124 Wis. 490, 501, 102 N. W. 401; *People ex rel. Palmer v. Travis,* 223 N. Y. 150, 166, 167, 119 N. E. 437; *Prince v. Crocker,* 166 Mass. 347, 362, 44 N. E. 446.

That the highway here, in which the town is interested only as an arm of the state to carry out a governmental function, and for default in which carrying out it is liable to third persons injured by express legislative declaration only (*Uecker v. Clyman,* 137 Wis. 38, 118 N. W. 247), ought to stand in no better, higher, or different position than the state itself if its property were injured by the building or maintenance of a dam on a navigable stream by express legislative grant, would seem to be a reasonable conclusion. If this were the state itself complaining, it would be foreclosed from relief by what this court said in *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 659, 11 N. W. 443, particularly what was said at p. 676, viz.:

"At the time the charter was granted to the plaintiff, the lands along the river where it would be necessary to make embankments and levees, were, to a great extent, owned by the state; and as there were no means provided by the charter by which the corporation could acquire the right to make such embankments or levees upon the state lands by

.making compensation to the state, while the charter contained provisions for acquiring the right from private owners, although such provisions may have been insufficient to accomplish that purpose, it would seem to be a fair inference that the legislature intended to grant the right of such use to the corporation without compensation as to all lands owned by it which it would become necessary to use in executing the purposes of the grant."

As against one doing all that it is claimed causes the alleged injury by direct legislative warrant and which it cannot "successfully carry out" without maintaining the height of water alone responsible for the injury, there ought to be shown clear constitutional or legislative warrant for the right to maintain this perpetual and ever renewable claim.    The necessity of legislative warrant for compensation is discussed in such cases as *Eltor v. Tacoma,* 228 U. S. 148, 33 Sup. Ct. 428, holding (p. 150) that a city as agent of the state in making streets in a governmental function is not liable for consequential damages in absence of legislation so providing, and in *Mitchell v. U. S.* 267 U. S. 341, 45 Sup. Ct. 293; *Joslin Co. v. Providence,* 262 U. S. 668, 675, 43 Sup. Ct. 684; *In re Board of Water Supply,* 211 N. Y. 174, 183, 105 N. E. 213; *Earle v. Comm.* 180 Mass. 579, 583, 63 N. E. 10.

The liability, if any, of the defendant ought, it would seem, to fall under some recognized principle of law under which one can be held liable by reason of the use of his own property causing injury or damage to another.    There is clearly here no express statutory liability.    Neither is there here any liability arising upon contract, as there was in the case of *Levis v. Black River Imp. Co.* 105 Wis. 391, 81 N. W. 669; *Dekorra v. Wis. River P. Co.* 188 Wis. 501, 205 N. W. 423.    If it be predicated upon the theory of a tort—that is, that the defendant has breached some duty or obligation that it owes to the town,—it would seem that it could only fit in with the theory that by main-

taining the waters at such a height there is such damage done to the highway that the defendant is maintaining a nuisance; that is, a condition of things on its property whereby damage is unlawfully caused to another. But being directly and expressly authorized by the legislature, it cannot be questioned as a nuisance by private persons (*In re Southern Wis. P. Co.* 140 Wis. 245, 262, 263, 122 N. W. 801, *supra;* 2 Cooley, Torts (3d ed.) 1292; 20 Ruling Case Law, 500); and being authorized by the state, a court cannot prohibit or enjoin its erection or maintenance. *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 353, 116 N. W. 4; *Milwaukee-Western F. Co. v. Milwaukee,* 152 Wis. 247, 256, 139 N. W. 540, involving permission by federal authority; *McDonald v. Apple River P. Co.* 164 Wis. 450, 456, 160 N. W. 156; *State v. Sutherland,* 166 Wis. 511, 524, 166 N. W. 14; *Water Power Cases,* 148 Wis. 124, 145, 134 N. W. 330; *Dekorra v. Wis. River P. Co.* 188 Wis. 501, 205 N. W. 423. See, also, *Sheboygan v. Sheboygan & F. du L. R. Co.* 21 Wis. 667, 671.

There is no possible way suggested in which the defendant can maintain the dam at the prescribed height across the Wisconsin river and avoid the back water in time of high flood from coming upon these highways; so that if it is to be held liable because creating a nuisance, such nuisance arises from the defendant doing exactly that and nothing more than which the state has expressly said it may lawfully do. The defendant clearly could not be prosecuted for a misdemeanor on the theory that it was maintaining a public nuisance. *Stoughton v. State,* 5 Wis. 291; *State v. Webb's River Imp. Co.* 97 Me. 559, 55 Atl. 495.

Again, it must be remembered that inasmuch as it has been expressly held by this court in *Cohn v. Wausau Boom Co.* 47 Wis. 314, 324, 2 N. W. 546, that such corporation is a *quasi*-public corporation (*Att'y Gen. v. Railroad Cos.* 35 Wis. 425), an agent of the state for the improvement

of the river (*Wis. River Imp. Co. v. Manson,* 43 Wis. 255), there surely ought to be some express legislative restriction or condition to that effect as there is as to railroad corporations, to make such *quasi*-public agent liable, rather than the somewhat indefinite and undefined ground set forth in the majority opinion.

There is cited in the majority opinion *Wells v. Wis. River P. Co.* 167 Wis. 345, 167 N. W. 445, which held that the injury to a person whose land was rendered unfit for agricultural purposes by reason of the stoppage of its underground drainage by the back water of the dam was within sec. 1777*e, supra,* in that the owner could, in condemnation proceedings, obtain compensation for such because he was *injured,* as that word was used in said statute. That case did not hold that there was any common-law right of action for such, but only that it was to be compensated for in the eminent domain proceedings, and certainly not that it gave rise perpetually to a new right after each flooding, as is the holding by the majority here. If the doctrine of that case were applied here, then, if not barred by the statute, there could be but one assessment of damages, and that final.

The case of *Inhabitants of Andover v. Sutton,* 12 Met. (53 Mass.) 182, also cited in the majority opinion, was an action against the company maintaining a dam upon a *non-*navigable stream, and it was there held that there is no remedy provided under their Milldam Act (applying only to non-navigable streams and substantially the same as ours) for an injury to a highway, and that therefore the town had its right of action at common law because no remedy was afforded under the Milldam Act; but the court there expressly stated (p. 187) that under the facts there shown, an indictment against the defendants for a nuisance in overflowing the road would have been sustained. There, of course, the dam, being built under the general authority of the Milldam Act by private persons at their own peril as to

height and extent of flowing, is clearly not analogous with the dam built here on a navigable stream and by express legislative authority. This proposition that a milldam owner in a *non*-navigable stream overflowing a public highway is liable to indictment for the maintaining of a nuisance is again stated in *Cheshire v. Adams & C. R. Co.* 119 Mass. 356.

I am authorized to state that Mr. Justice ROSENBERRY and Mr. Justice DOERFLER join in this dissent.